UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs. No. 2:98-cr-21

RAYMOND FRANK TEEPLE,

Defendant.
______________________________/

MOTION TO MODIFY TERMS OF PROBATION

BEFORE THE HONORABLE R. ALLAN EDGAR

Marquette, Michigan - Friday, August 20, 2010

APPEARANCES:

For the Plaintiff: Mr. Paul D. Lochner
Assistant United States Attorney
1930 U.S. Hwy. 41 West
Marquette, MI 49855
(906)226-2500

For the Defendant: Mr. Paul A. Peterson
Federal Public Defender (Marquette)
100 North Front Street, Ste. 104
Marquette, MI 49855
(906)226-3050

Reported by: Sandra A. Larson, CSR-2916, RMR
NORTHERN REPORTERS
P.O. Box 27
Marquette, Michigan 49855
(906)226-2706

TABLE OF CONTENTS

JOSHUA HECHTMAN

Direct Examination by Mr. Lochner . . . . . . . 7

Cross-Examination by Mr. Peterson . . . . . . 16

EXHIBITS

None.

Marquette, Michigan

Friday, August 20, 2010 - 9:28 a.m.

THE COURT: Next case?

THE CLERK: The Court calls the case of United States versus Raymond Teeple, Case Number 2:98-cr-21.

THE COURT: All right. In this case the Court notes for the record that Mr. Teeple is present, along with his counsel, and of course, also present is the Assistant United States Attorney, Mr. Lochner. Mr. Teeple, the government has petitioned the Court here to modify -- There has been a petition filed by probation to modify the conditions of your supervised release to require you to take a polygraph exam. And do you understand that that's what we are here to talk about today?

THE DEFENDANT: Right.

THE COURT: Okay. And, Mr. Peterson, I have read your response to that, but did you want to verbally tell me what you think about that at this time?

MR. PETERSON: If I could briefly, Your Honor, because I know the government just filed its --

THE COURT: I saw the government's response, too.

MR. PETERSON: Your Honor, the issue here is the defendant's objection to the proposed addition of condition number eleven. It is the condition the Court just mentioned, sex offender treatment -- or sex offender assessment and/or treatment as approved by probation is really the gist of the condition. I think both Mr. Lochner and I agree that the Court has authority under 18 USC 3583 (e)(1)to modify, reduce or enlarge the conditions of supervised release. However, that authority doesn't appear to be endless or unlimited. 3583(d) does indicate that there are at least limits within the Court's -- within which the Court must work. The newly proposed condition must be reasonably related to the nature and circumstances of the offense -- of the offense and the history and characteristics of the defendant; and they also tie into deterrence, protection and treatment, although not punishment or respect, the first factor of sentencing. But it is also something that can't be any greater deprivation of liberty than necessary for deterrence, protection or treatment. Also must be consistent with policy statements.

Looking at the nature and circumstances of what originally happened in this matter, I did make a mistake in my objection to the Court, and both of these

incidents, while under a violation of 2241, one involved a sex act, one involved sexual contact, Mr. Lochner correctly indicated that in his response. There may indeed have been multiple events, as noted by Mr. Lochner. But in fact, Mr. Alexander has already been sentenced to 121 months, 120 months concurrently, five years and three years of supervised release. In fact that three year term is almost basically up, so we really are only dealing with the one five-year term. $1,200 worth of restitution, $200 of special assessment all have been paid.

Our fundamental belief, Your Honor -- The defense's fundamental belief is that a modification of probation is usually done for a reason, and here it doesn't appear that there is any specific reason put forth by probation to justify that modification.

THE COURT: Do you think we have to wait until something bad happens in order to make a modification?

MR. PETERSON: I think the Court -- I think the Court does if the Court has -- yes, if the Court has already sentenced Mr. Alexander, and he has been consistent with those terms of supervision, yes. Then I think whether it is something bad or it is something good -- because the Court can always modify to withdraw

conditions.

THE COURT: Okay. Well, we are talking about not --

MR. PETERSON: I know. I know the Court is talking about something bad, yes, and that is maybe a tough comment to make. But I think indeed, when you contemplate a modification, whether it be an enlargement or a withdrawal, I think you are contemplating an event. It may be horrible, but it may not be horrible, it may just be something minor, as happened in his case when he had alcohol use.

THE COURT: Why don't we -- I see we have Mr. Hechtman here, Mr. Lochner. Do you think it might be appropriate to hear a little testimony here about why this condition is something that is desirable?

MR. LOCHNER: Your Honor, I think not only for that, I was also going to suggest it might be helpful to have probation explain typically what that entails because --

THE COURT: And -- What it is, yeah, what is involved and why we need it.

MR. LOCHNER: Right. That would certainly clarify a number of things.

THE COURT: Okay. Why don't we do that? Then maybe we can have argument later.

MR. PETERSON: Fine.

MR. LOCHNER: The government calls Josh Hechtman.

THE COURT: If you would come up here, Mr. Hechtman, and raise your right hand, and we will swear you in here.

THE CLERK: Do you swear or affirm that the testimony you are about to give in this matter before the Court will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

JOSHUA HECHTMAN

having been first duly sworn at about 9:34 a.m., was examined and testified on his oath as follows:

THE CLERK: Thank you. You may be seated.

DIRECT EXAMINATION

BY MR. LOCHNER:

Q Mr. Hechtman, just so I don't irritate the court reporter here, I am going to have you state and spell your last -- your full name and spell your last name.
A My name is Joshua Hechtman, H-E-C-H-T-M-A-N.
Q And you work for United States Probation?
A Correct.
Q And how long have you worked with U.S. Probation?
A Approximately two-and-a-half years.

Q And are you familiar with the case of the United States versus Raymond Frank Teeple?
A Yes, I supervised Mr. Teeple for a short period.
Q You weren't the initial -- You weren't the person who initially prepared the pre-sentence investigation report in this case?
A No, I was not.
Q You have assumed supervision of Mr. Teeple through the course of your duties?
A Yes.
Q All right. And you have had the opportunity then to review his file and familiarize yourself with the case and the pre-sentence report that had been prepared in this case?
A Yes.
Q Can you describe for the Court why it is that probation has recommended the modification of Mr. Teeple's conditions of supervised release, to include the proposed term of sex offender treatment or evaluation?
A Well, I believe it was in approximately May of this year that myself and my supervising officer began to staff a separate case and discussed the benefit of having that other individual perform a polygraph examination. That's something that hasn't previously been available in this area because we didn't have a

polygraph examiner who we could contract with. And in that discussion, it was determined that it might be best to perform polygraph examinations for -- for all people convicted of a sex offense who are supervised in the Northern Division of the Western District of Michigan.

As a result, we explored further the ability to contract with somebody, the fact that he could in fact meet with the approximately 11 different individuals we have convicted of a sex offense that are supervised in this area of the district. And then we set upon making modifications of supervised release to those individuals who did not have a condition allowing such an examination, and one of those individuals was Mr. Teeple.

The basis for doing this was that there was increasing evidence that -- that a polygraph examination -- a maintenance polygraph examination can help determine the compliance of an individual with their various conditions of supervised release, as well as make sure that no new offenses have occurred.

And this -- It is my understanding that this isn't something that was in practice, both at the time Mr. Teeple was sentenced, as well as it wasn't something available to us at that time either.

Q Is there -- Was there anything that Mr. Teeple had done during the course of supervised release or anything that's occurred during the time where he has been on supervised release that led you to recommend that term or is this simply -- was this simply something that you looked at in terms of a tool that's available for the supervision of all sex offenders within the district?

A I believe it was more of the latter, that this is something that's now available for the supervision of all sex offenders in the area.

Q You mentioned that there were two factors that kind of led to the idea that this is why this wouldn't perhaps have been a condition back at the time Mr. Teeple was sentenced. And you mentioned that one of those was simply the lack of a polygraph examiner with whom probation could contract to have that kind of evaluation done. The other was that it wasn't something that was typically done. To your knowledge, have the guidelines been modified over the course of time to provide that if the offense of conviction or sex offenders -- or is a sex offense, that a condition requiring the defendant to participate in a program for treatment and monitoring of a sex offender is appropriate?

A I am not aware of whether there is a change in the

guidelines, but I would say, as a pre-sentence report writer, it is generally my practice now, as I prepare a pre-sentence report, to include a condition that that person have as a condition of their supervised release a recommendation that they participate in such evaluations. An important part of that condition that we are attempting to add in Mr. Teeple's case is that -- It is a two-pronged condition. It allows not only for those examinations, as well as sex offender specific services, which, if necessary for Mr. Teeple, without this condition, we could not contract for right now.

Q All right. Could you describe what the nature of the treatment program is that you are doing currently for sex offenders in the district? What does that entail? In other words, how much of a burden is that or how much time does that take for someone to go through an assessment or counseling or the polygraph examinations?

A Well, previously if somebody wanted to do a polygraph examination -- and we have had individuals actually interested in a polygraph examination in order to assist them with an early termination of supervised release, if they wanted to do so, they had to travel to Grand Rapids. Now, having the ability to contract with a polygraph examiner, it is our intent to continue to

do such polygraphs on an annual basis. And so for some individuals -- for example, one individual that completed the polygraph examinations that we scheduled in early June, he was released just several weeks prior to that on a supervised release, and that was his initial baseline. We will see if further polygraph examinations demonstrate a change in the course of his conduct over the period of supervised release.

The remainder of services that may be implemented based on this condition would depend somewhat on what geographic area somebody is in within the Northern District -- the Northern Division of the Western District of Michigan. For example, in Mr. Teeple's area, through our service provider, we are able to contract for individual sex offender specific therapy, as well as group therapy, which may occur once a week. So I could say the greatest burden possibly placed on an offender as a result of these -- of this special condition would be weekly individual sessions with a certified sex offender therapist; weekly group therapy focused on sex offender specific behavior; as well as annual polygraph examinations, unless there was a particular need that somebody submit to one more frequently. Then they may be required to travel to the Grand Rapids area for that specific examination,

related to maybe new conduct arising. However, it is our intent, as far as these maintenance polygraphs, to only do them on an annual basis.

Q Okay. So the plan would be to do one polygraph examination in the course of a year unless there was something that came up through the course of the -- a polygraph examination that suggested that it was somehow appropriate to do it more frequently?

A Exactly. And if I could speak to Mr. Teeple's case specifically, it is my understanding our intent is only to have him perform this maintenance polygraph. I don't think there is an intent to resume individual sex offender specific therapy or group sex offender specific therapy, unless the polygraph examination demonstrated a need for such services.

Q All right. And if such services were deemed necessary, about how much time -- how much time during the week would it take to attend individual and/or group counseling sessions?

A Each of those would typically be an hour. I would imagine, for Mr. Teeple to transport himself there, may involve another 15 to 20, possibly half an hour time in transportation, so possibly four hours a week to be devoted to those services.

Q All right. And having reviewed the pre-sentence

report, and being familiar with Mr. Teeple's case, would the facts as you saw them in the pre-sentence investigation report suggest that it is an appropriate thing --

A Absolutely.

Q -- to test for compliance and to decide whether or not Mr. Teeple would be a candidate for sex offender evaluation and counseling?

A Yes. I think, in my opinion, sex offenders are a particularly difficult group to supervise. They are typically compliant in the other areas, but sex offenses themselves are typically more difficult to detect, and that's why the polygraph examination is an important tool.

THE COURT: Let me ask you this, Mr. Hechtman, the A-B -- just for the record, A-B-E-L assessment, what is that?

THE WITNESS: An ABEL assessment involves the -- an examiner showing a client a series of images, and those images are various in nature. Some of them may involve different perversions of sex, and the examiner would then assess the client's stimulation, based on those various images. So if the client is shown a series of images related to child pornography and the result is that they are stimulated by those images, the

assessor is able to know that that person is in fact interested in that form of pornography.

THE COURT: How do you determine whether or not the offender is interested in those pictures of whatever he is being shown?

THE WITNESS: I believe the assessor looks for a physiological response related to those images. However, I would say that the ABEL assessment is not something that we have utilized, in my experience.

THE COURT: You haven't utilized it?

THE WITNESS: No, we have not.

THE COURT: Well, I know -- I just mention that because that was one of the -- one of the requests -- part of the request here.

THE WITNESS: The condition that we are asking to be added to Mr. Teeple's supervised release is a condition with wording that was agreed upon, by my understanding, of the judges meeting for our district. These are, in a sense, standard special supervised release conditions. So the wording of this condition wasn't written specifically for Mr. Teeple. This is the same wording that would be included for anybody that such examinations or sex offender specific services were recommended for within our -- within the Western District of Michigan.

THE COURT: In Mr. Teeple's case, though, you wouldn't be doing that assessment unless -- unless something turned up on the polygraph, is that fair to say?

THE WITNESS: That's correct. In my understanding, Mr. Teeple has been compliant with his supervised release. And so I don't know that there would be other services beyond the polygraph unless there was something demonstrated by the polygraph examination.

THE COURT: Okay. All right. Mr. Peterson?

CROSS-EXAMINATION

BY MR. PETERSON:

Q The condition that is proposed here then is apparently something that came out of a judge's conference?

A Yes.

Q So when you talk about your basic purpose here is to have Mr. Teeple undertake a maintenance polygraph, that's not what this says, this is much more encompassing?

A Yes. Sorry, yes.

Q And I gather that this maintenance polygraph, you said there were like 11 or 12 individuals under supervision that you propose this to?

A Yes.

Q Are we talking sexual abuse defendants?
A Yep.
Q Child porn?
A Yes.
Q Other types of distribution of pornography?
A Yes.
Q So it is both pornography and sex offenses?
A Yes.
Q But that's where it is limited?
A Yes.
Q Do you know of any reason why, if this polygraph is apparently such a -- considered a useful tool, that it is limited to sex offenders and pornographers?
A No.
Q You would be just as interested, I would assume, in finding out if somebody that's been a felon in possession was complying with his conditions of probation and not violating?
A Yes.
Q And most -- How many other -- Are there any other classes of individuals on supervision that have polygraph requirements?
A No, there are not.
Q And again, as I understand it, do you know what -- what is going to be, you know, a prompt out of this

polygraph that's going to cause your office or someone else to say, okay, we have got to go to the next step, or we have got to go with the next program?

A We discussed that ahead of time, yes, we did.

Q Okay.

A What we -- There were a couple of issues we are interested in, and one would be -- one would be the offender's likelihood of being involved in things that may be a trigger for them. Say, for example, a person convicted of possession of child pornography was in possession of pornography, which is a violation of their special conditions of supervised release. Another thing we were interested in was, had a new sex offense of some type occurred that we were unaware of, and that may be a situation that would prompt further investigation, rather than just a compliance response. And then in addition, I guess we were interested in those that were fully compliant. If people are doing the right thing, we want to know and in turn reduce our amount of supervision on them.

I had one individual that I was suspicious of his activities. The polygraph examination revealed that there was no cause for concern, and in turn, we have backed off on him a little bit.

Q Do I gather you have any suspicions or concerns with

Mr. Teeple at this point?
A Not particularly, no.
Q He has been on supervision for approximately three years?
A Yes.
Q One violation I know for an alcohol offense?
A (Witness nodded head.)
Q Right?
A Yes. Yes, sorry.
Q Correct? Currently employed?
A Yes, he is.
Q Do you understand what his employment is?
A Yes, I do.
Q Could you explain that?
A I believe he is employed doing some janitorial work, some cleanup work for the casino, in Brimley, Michigan, usually works the night shift.
Q Have you been in touch with his employer to verify this or to find out how he has been doing?
A Not recently, not myself. But Mr. Teeple submits pay stubs related to his employment as verification that he is working there.
Q Any concern about that employment?
A No.
Q But as I understand it, the language of this particular

condition, although it may start in your mind with a polygraph exam, if there are concerns -- there could be any variety of concerns -- we open up a whole Pandora's box of available other activities, other conditions, other obligations that he would then have to meet to satisfy that condition?
A Right. By my view, the condition, it is designed both for the examination and the response, so as to prevent us from coming back to the Court to ask for, okay, we found a concern. Now, we would like to -- we would like a separate condition related to some services. So it is two-pronged in that approach.
Q Okay. So we have kind of our investigative tool and then we have our solution tool?
A Yes. That would be my view of it.
Q And that includes everything from, as you indicated, the possibility of weekly sessions --
A Um-h'm.
Q -- that might be available here now?
A Yes, yes.
Q But this ABEL assessment, even though you said it is not -- it is not something you are using now, that's authorized?
A Yes. That would be a possibility.
Q Physiological testing would be authorized?

A Yes.
Q Basically, anything that your office felt was appropriate as a -- as a response to something in the polygraph is authorized?
A Yes.
Q Things that you may not even be aware of now, but may be told of in six months or a year as a possible action to take?
A You mean as far as forms of testing?
Q Forms of testing, forms of treatment, forms of response.
A That's true, yes.
Q I know in response to Mr. Lochner's question, you felt that this was appropriate in Mr. Teeple's case, indicated that -- I think your comment was that you felt sex offenses were more difficult, what, to detect if there is violations?
A Yes.
Q Do you -- Have you found any difference between the individuals that maybe are considered sex offenders for pornography and those that are considered sex offenders for sex offense crimes, as far as the ability to detect violations?
A Yes and no. I would say if somebody's true propensity, in my experience, is to -- a likelihood toward child

pornography, something we may see in the home would be an unauthorized computer or we may see them going, for example, to a library to access a computer through that means; whereas somebody that's more inclined to a hands-on sex offense, as I would categorize it, may be more likely to frequent locations where the object of their sexual desire is found. However, I would admit both populations would have possibly a likelihood to engage -- to cross over to those different types of behaviors. So I wouldn't say either category is mutually exclusive of behaviors to the other.

Q Is there any indication, in the record or through your supervision of Mr. Teeple, that he might be one of those that would cross over between sexual abuse and being involved with child pornography?

A No. I believe Mr. Teeple is allowed to have a computer, or access to a computer, and that's not something we are seeking to modify here either.

Q In fact, as I understand it, his violation was for sexual abuse with his underage daughter?

A Correct.

Q And I think maybe another family member?

A Correct.

Q Do I understand correctly that there -- you know, his daughter certainly is an adult at this point?

A Right.
Q Are you aware of any other underaged family members, female, that he has contact with?
A There was a report at one point from the Bay Mills Police Department, and I believe that was in the late winter, spring of this year, that Mr. Teeple was dating a woman who had a minor daughter. There was a question as to whether Mr. Teeple was having contact with her in an unsupervised setting. Mr. Teeple reported that he in fact was not, and shortly after, ended that relationship with the woman, regardless. And so there would be no longer any contact.
However, I would not say that our implementation of this condition is a specific response to that incident. Again, this is something we sought to implement with all people convicted of a sex offense in the Northern Division.
Q A final question, and just -- It was just something I was thinking of as you were answering this question -- Am I correct, we did talk about the polygraph that you are asking about in this case, it could also be beneficial to Mr. Teeple?
A Absolutely.
Q And am I correct that you indicated that you have had other situations with other individuals under

supervision who wanted to get off early, that could request a polygraph?
A Absolutely. Yes.
Q And it is something that your office has then considered for the possibility of early release?
A Yes.
Q Not that I am saying that Mr. Teeple is interested in that or would want to do that, but at least, to address that possibility, that the polygraph could also help him?
A Yes.
Q He could at any time individually come to your office and ask for a polygraph exam?
A Yes, although I would have to get some clarification on whether we would have to have this condition in order to contract and pay for it, but I -- I would say the potential is there, if Mr. Teeple wanted to do a polygraph examination and furthermore wanted to pay for it himself, we welcome the results of it and that may be beneficial to potential for early termination, so while unlikely, yes, I suppose there is a potential that if he wanted to do his own polygraph examination, and we were happy with the results, he could do a polygraph examination without this special condition and that would facilitate his early termination.

MR. PETERSON: I have nothing further. Thank you.

THE COURT: Okay. You can step down.

(The witness was excused at about 9:55 a.m.)

THE COURT: All right. I think I have kind of the situation here. Anybody want to add anything? Do you want to add anything, Mr. Peterson?

MR. PETERSON: I do briefly, Your Honor. I will try to be brief. I know the Court has had the opportunity to read the arguments that the parties have filed. Again, going back, when the Court stopped, I had indicated again, we feel that still, in order to have a modification, whether you are going to be enlarged or subtract from supervised release, that there has to be some triggering event. The petition, as Mr. Hechtman has indicated, does not express any reason, and clearly it appears from his testimony that it was more of a policy directive that resulted from another individual who had been involved with a polygraph.

Mr. Lochner has argued that prior convictions and Mr. Teeple's pre-sentence report does justify the addition of this condition. We would argue that these matters have not changed in the last 11 years. These were in fact the issues the Court had before it when it

imposed sentence the last time, and imposed the conditions that it did. What has changed -- and if there has been any factor or issues that the Court should be looking at, it is the history and characteristics of this defendant, a fact which the Court needs to take into consideration.

Mr. Lochner has argued that it is wrong to in a sense look at Mr. Teeple's history and characteristics. In his argument he said the defendant's prior record of violations is of no moment to the issue at hand, nor is his gainful employment. It isn't necessary to show the defendant poses any unique risk of recidivism or is engaged in questionable conduct to reach the conclusion that sex offender treatment is appropriate. And I totally disagree with that.

I think indeed what we have here, and what is currently authorized by 3583(d) is a review of his history and characteristics. It shows that when reviewing those history and characteristics, that Mr. Teeple has engaged in appropriate rehabilitation. He has done everything that this Court asked him to do back in 1999. There is no support for this proposed condition, as directed specifically to Mr. Teeple. He did his term within the BOP with one violation. He did

three -- He has now done three years or approximately three years of supervised release with one violation. He is working at Bay Mills, as has been testified to. He is 61 years old.

The government says that the nature and circumstances of the offense suggest significant risk of recidivism, and while they do, the history and characteristics of the defendant now shows no risk to engage in conduct with his daughter or with any other young relatives.

I would submit, and I think, there is tests and studies that show --

THE COURT: How about other people?

MR. PETERSON: I think there is always a risk of that, Your Honor. I don't think there is --

THE COURT: There is always a risk.

MR. PETERSON: There is a risk with everybody.

THE COURT: Yeah.

MR. PETERSON: There is a risk with felons in possession.

THE COURT: Yeah, there is a risk. I mean, there is a risk with everybody, including Mr. Teeple, and everybody who is on supervised release, especially for these kinds of offenses, isn't there?

MR. PETERSON: There is, but the requirement is that --

THE COURT: What's wrong with -- What's wrong with minimizing that risk? What can the Courts do here to protect the public?

MR. PETERSON: I think the Court has already done what is reasonable and necessary to protect the public. I would submit that through some of the studies that we have looked at, that come out of the Department of Justice, that incest defendants, as Mr. Teeple is, represent even the lowest risk of sex offenders.

The Center for Sex Offender Management, out of the Department of Justice, in a 2000 treatise, Myths and Facts About Sex Offenders, indicated that there is a nine percent risk of recidivism with incest victims -- or incest defendants. That same center, in another study from 2001, Recidivism By Sex Offenders, indicated there was a four percent risk of recidivism by incest defendants.

We can do it for everyone, Your Honor, but the point is whether it is reasonable, whether it is reasonably related to his conduct, his offense, and his current history and characteristics.

THE COURT: So you are saying that since

there is only a nine percent or a four percent historical statistical probability that he would reoffend, that we --

MR. PETERSON: That we just ignore it?

THE COURT: -- just ignore it; right?

MR. PETERSON: I think that's one of the factors this Court needs to take into consideration. If we were here -- and I guess let me -- let me quickly go to the last comment Mr. Lochner indicated, and I know Mr. Lochner was looking and has argued that this condition is now consistent with the policy statements, and he cited the policy statement from 5D1.3(d)(7), and yes, that's in the guideline book now. The interesting thing is that that policy addition, that says the instant offense -- If the instant offense of conviction is a sex offense, as defined by Section 5D1.2 (term of supervised release), a condition requiring the defendant to participate in a program approved by the United States Probation Office -- I am sorry, Sandy -- for the treatment and monitoring of sex offenders is permitted, it is a condition of supervision. That was added in November -- effective November 1, 2001, nine years ago.

Now, I don't know why it has taken until this moment for this office to decide that they want to add

this condition to Mr. Teeple. Perhaps --

THE COURT: Well, Mr. Hechtman said we didn't have the polygraphs, for example -- we didn't have the polygraphs available until recently.

MR. PETERSON: But this doesn't just say polygraph, Your Honor, it says treatment -- a program of assessment and treatment.

THE COURT: Yeah.

MR. PETERSON: Instead of the polygraph. I mean, I am not trying to do his job for him, but they have taken him and had an assessment done.

THE COURT: Well, you know, maybe the Court made a mistake by not putting that -- putting that condition in back then, when I sentenced Mr. Teeple.

MR. PETERSON: I may have argued in my written argument, Your Honor, that the Court may have made a mistake.

THE COURT: Yeah.

MR. PETERSON: But that condition wasn't there. It was added in 2001. The Court sentenced Mr. Teeple in 1999. The point I was making is, when that was added, had probation come to the Court even while Mr. Teeple was incarcerated and said, this is now a condition that we are going to be adding in all of these cases, it would be a little different issue. The

issue we have here is we have a three-year -- potentially 11-year, considering the time in prison, but I agree with Mr. Lochner, we don't have young girls in prison. There is little likelihood that Mr. Teeple would have gotten involved with young girls in prison. He might very well have gotten involved with other types of sexual offenses that the Court is referring to, but the fact of the matter is we have an 11-year track history of perfect compliance.

THE COURT: Did you say here that there was a statutory provision which prohibited the adding of this?

MR. PETERSON: No, no. I don't think there is any -- No, there is no statutory prohibition. I think the Court, as we both argued to the Court, has the ability and the authority to modify, by either enlarging or withdrawing conditions of supervision, but there is the additional statute that both of us have cited to the Court, 3583, that talks about the restrictions and the relationship that that condition must have to the purposes of sentencing under 3553(a), in order to be added.

THE COURT: Okay. Where is that, 3583 what?

MR. PETERSON: 3583(d) -- 3583(e)(1) talks about modifying, reducing and enlarging. 3583(d) talks

about it being reasonably related, which is basically the statute that talks about conditions that should normally be added.

THE COURT: I am looking at the statute. I don't think it -- It doesn't seem to me that that addresses the point you are making here. It just says after considering the 3553 factors, I can terminate supervised release, I can extend it, I can revoke it.

MR. PETERSON: Oh, we know you can do a lot more, Your Honor.

THE COURT: I have no doubt that there is statutory authority for it, but I -- I don't see it. 3553 -- 3583?

MR. PETERSON: Yeah. We have talked about 3563, but that deals with probation, Your Honor. I guess I can't -- Maybe Mr. Lochner can put his hands on it right now, Your Honor, but I think, again, his --

THE COURT: Okay.

MR. PETERSON: -- Mr. Lochner's response, I think, mirrors mine to a degree. He begins, as the defendant readily concedes, the Court has the power to impose conditions that it deems and may modify, reduce, and enlarge, and cites these statutes. And then it goes on to reference 3583(d) (1) through (3). And that's really the reference that I had.

THE COURT: Okay. Anything else you want to add, Mr. Lochner?

MR. LOCHNER: I guess just -- Your Honor, I don't think -- I imagine the Court has already noted this, there is nothing that I can see that says under 3583(d), that there has to be a triggering event in order for the Court to modify --

THE COURT: Yeah.

MR. LOCHNER: -- the terms of supervised release. I guess, I -- my point would be, when you talk about the history and characteristics of the defendant, that does not just encapsulate the time when he is in prison. These are sex offenses against young girls. As I said --

THE COURT: Yeah.

MR. LOCHNER: -- there is no chance of him recidivating in that period of time against young girls because they are not available to him. The other thing I would say is to argue, well, that there is no evidence -- and there was a question that was asked of Mr. Hechtman to this effect, there is no evidence -- in fact, the question was along the lines of do you require polygraph exams for other kinds of crimes. I guess my suggestion would be the difference is, if I have a felon in possession, probation can go into the

home and see if they have any firearms. That's something they could do physically. If they have someone who is convicted of a drug offense, you have drug testing that tests them randomly to see whether or not they are using drugs.

Sex offenses are historically underreported, and it is kind of the self-licking ice cream cone to say, well, because no one has reported anything as of this date, therefore he is compliant with all of the terms. You can look at the PSR in this particular case, and look at one of the victims that was identified here didn't say anything until she was an adult, and that was years and years after the fact. And if that were something that happened here, the whole term of supervised release expires before someone makes a disclosure, well, that's -- that's the end of the game because supervised release has already expired.

And I guess, finally, Your Honor, I think -- and I am not trying to be glib, but, you know, doctors used to treat people by putting them in a tub and throwing leeches on them. And now we have much more advanced ways of dealing with that. And sometimes as we go along and the Sentencing Commission adds various things into the guidelines or makes things more

explicit, it is precisely because there has been more research or there has been more information that has come out that has shed a little bit more light on some of the penological concerns that the Sentencing Commission is dealing with.

Back at the time, right before this, back in 1999, the guidelines provided that you could order mental health treatment and counseling as appropriate. And I think all the guidelines really did was they made it explicit a couple of years later by saying, in a sex offense case this is the case. So it didn't preclude it back in 1999, it just wasn't expressly listed as it is today.

THE COURT: Okay.

MR. LOCHNER: And we think it is appropriate, in light of the conditions that are imposed routinely today, that it doesn't impose any kind of an undue burden upon a defendant to undergo this kind of assessment or treatment, and it does -- it clearly satisfies the factors that are set out in the statute.

THE COURT: Okay. Mr. Teeple, is there anything that you want to say to the Court?

THE DEFENDANT: No, not really. There is just that -- one correction on there.

Last winter, they said I was dating this

woman, and the child was a male. And they were -- her and the father were having -- the child's father were having visitation issues over it, that's where my name got into it. And that's about all I got to say on that.

I don't feel that the polygraph -- If I can't use the polygraph in court to prove my innocence, I don't feel I should have to take it now, for any reason. That's all I got to say about that.

THE COURT: All right. Okay. Well, here is what I think. In making the decision here, I am considering the general sentencing factors that we always consider in connection with sentencings, 18 United States Code Section 3553(a). The defendant is, of course, a sex offender whose conduct involved children under the age of 12. When the Court originally sentenced Mr. Teeple, it did not impose any conditions regarding protecting the public from his -- of any sexual activities that he might -- illegal sexual activities that he might be involved with. And, frankly, the Court should have done that.

There are some explanations for it, however, one of which has been brought out here today -- as has been brought out here today, the polygraphs, for example, were not available at that time when I

sentenced -- at the time that I sentenced Mr. Teeple.

The defendant is an older gentleman who has done reasonably well on supervised release. However, the problem is, frankly, we do not now know how much of a risk he is to the public as far as his sexual proclivities are concerned. I think the modification is necessary to ensure that the public is protected. There may not be a problem here with Mr. Teeple, but the fact is we don't know. And I don't think we have to take a chance that there is no problem. And I do not think that we need to wait for some indiscretion or unlawful conduct on Mr. Teeple's part in order to impose this condition.

If I were sentencing Mr. Teeple today, I would surely put this provision in, the proposed modification in, as a part of the conditions of his supervised release. I don't think this condition is unduly burdensome. Basically, what it amounts to, it looks like, the way that probation is going to handle this is that if a polygraph indicates that there may be a problem, then they go into the other testing and therapy sessions that require maybe an hour a week. I can tell you that in other contexts, I have imposed much more stringent conditions of supervised release on sexual offenders. For example, this is -- there is no

requirement here for -- and I always have a hard time with this word -- ples- -- plethysmograph, or some such thing, which they used to impose -- or I have imposed in the past, but I don't do it any more, because frankly, I do feel that that is a bit too intrusive.

So I don't think that to take a polygraph exam maybe once a year and as a consequence of that, if there are reasons indicated in the polygraph, to engage in some sort of additional unintrusive sexual evaluation as well as weekly sessions is an excessive deprivation of liberty. The polygraphs and these testing things are merely a tool. I think they are a useful tool. And I do think that some discretion needs to be given to probation to prevent endless returns to Court for proceedings, such as the ones that we are engaged in here today. I think probation has to have the discretion to -- as we give them in many areas, to provide, for example, with a drug offender, drug treatment; with a mental defendant, to provide mental treatment; and I think with a sex offender, to provide appropriate sex treatment and evaluation.

So I am going to grant the petition to modify Mr. Teeple's supervised release. I think that you can appeal this, Mr. Teeple. If you wish to do that, discuss that with Mr. Peterson. Maybe we will find out

what the Court of Appeals thinks.

Are there any -- Is there anything further in this case? You have a -- I think it is ten days to -- maybe it is 14 days. Check with Mr. Peterson. He knows more than I know about appeals, and -- if you want to appeal it, of course. Anything further?

MR. LOCHNER: Not on behalf of the government, Your Honor. Thank you.

MR. PETERSON: No, not at this time. Thank you, Your Honor.

THE COURT: Okay. This Court is in adjournment.

THE CLERK: All rise, please. Court is adjourned.

* * * * *

(The hearing was adjourned at about 10:18 a.m.)

STATE OF MICHIGAN )
COUNTY OF MARQUETTE )

I, Sandra A. Larson, CSR-2916, Certified Shorthand Reporter, in and for the County of Marquette, State of Michigan, do hereby certify that the aforegoing is a true and complete transcript of the hearing, attended by me, held in the above-case on August 20, 2010.

DATE: ______________________ ______________________

Sandra A. Larson, CSR-2916
Certified Shorthand Reporter
Northern Reporters
P.O. Box 27
Marquette, MI 49855
906-226-2706